McMichael v. Webster.

## THOMAS McMICHAEL

### v.

## HENRY C. WEBSTER et al.

1. The vendor of real estate remained in possession of the premises after passing of the title, without the consent of the vendee, and collected some rents which accrued after such conveyance.—*Held*, that in the foreclosure of a consideration-money mortgage given by the vendee to the vendor, the vendee was not entitled by way of offset to an allowance for the use and occupation of the premises and the rent received.

2. While so in possession, after conveyance, the vendor committed waste upon the premises, resulting in a deterioration of their value.—*Held*, that the

McMichael *v.* Webster.

defendant was entitled to a corresponding abatement upon the mortgage given for consideration money.

3. The premises conveyed were a farm, consisting of four lots, bounding on one side upon a tidal stream. The call of the description of one course of one of the lots was along the course of the creek at low-water mark. In the pre- liminary negotiations the vendor falsely asserted that the farm contained one hundred and eighty-five acres, and the preliminary written contract for the sale described it as a farm containing "about one hundred and eighty-five acres, more or less." In point of fact, it contained one hundred and forty- nine acres and sixty-eight hundredths, by actual survey, and that was the sum of the footings of the four lots contained in the description in the deed under which the vendor held. The difference between one hundred and forty-nine and sixty-eight hundredths acres and one hundred and eighty-five acres came to the attention of the defendant at and just before the passing of the title, and the vendor, upon inquiry by the vendee, declared that the course of the creek had been changed and the protecting bank along its side had been pushed out, so that the quantity of one hundred and eighty-five acres was actually included within the description. This statement the vendor knew to be false.—*Held*, that the vendee was not estopped by the mention of acreage in the convey- ance from setting up the fraudulent representation in defence to a foreclosure of the consideration-money mortgage and being allowed an abatement therefor.

----

This is a bill to foreclose a mortgage upon land, dated the 12th of November, 1894, to secure $5,000 in one year, with interest semi-annually, with a clause providing for the maturity of the principal in case the interest was not paid. Default was made in the payment of the first six months' interest, and this bill was filed on the 18th of July, 1895.

The answer admits the making and execution of the mort- gage, and sets up several defences, which may be stated thus, in the inverse order of their importance:

*First.* That the mortgage was given for part of the considera- tion money of the conveyance by complainant to defendant of the mortgaged premises, and that the complainant remained in possession of the premises for several months after the convey- ance and time for delivery of possession had passed, and claims for use and occupation.

*Second.* That he collected in cash certain moneys for wharfage on a wharf situate on the mortgaged premises, which accrued after the conveyance.

*Third.* That while so in possession, after the conveyance, he

McMichael *v.* Webster.

committed waste upon the premises by cutting and carrying away trees, destroying sheds and fences and removing bridges.

*Fourth.* That the complainant willfully and fraudulently misrepresented to the defendant the quantity of land to be conveyed, namely, that he represented the mortgaged premises, which consisted of a farm, to contain one hundred and eighty-five acres, when, in point of fact, it contained only about one hundred and fifty acres.

The property was conveyed by the complainant to the defendant by deed dated November 12th, 1894, in pursuance of a contract in writing entered into between them on the 17th of October, 1894. So much of the contract as supports this last defence of the defendant is in these words :

"The party of the first part agrees to sell to the party of the second part all that farm, buildings, meadow &c., situate at Borden's Landing, N. J., containing about one hundred and eighty-five acres, more or less."

The land, as described in the title deed of the complainant, is comprised of four different tracts, which, when plotted, block in together and form one compact piece. These four tracts are stated in the deed to contain respectively one hundred and thirty-four hundredths acres, six and twenty-five hundredths acres, forty-one and ninety-seven hundredths acres, one and twelve-hundredths acres, a total of one hundred and forty-nine acres and sixty-eight hundredths of an acre, and two several careful surveys made during the hearing showed that it contained no more.

The farm is situate on the southwest side of Rancocas creek, a tidal stream in Burlington county, and about six miles from its debouch into the Delaware river.

By the calls in complainant's title deed of the description of the tract of one hundred and thirty-four hundredths acres which bounds on the creek, the line runs, as is usual in West Jersey, to low-water mark, and, of course, includes all the lands between high and low-water marks, and the surveys above referred to also ran to low-water mark. The course along the river is given in the deed without courses and distances thus, " thence northward and

northwesterly along the several courses of said creek or river to the place of beginning."

Along the river the farm has been protected from the overflow of the creek by an artificial berme-bank running parallel with low-water mark, the base of which is high-water mark.

*Mr. Charles E. Hendrickson*, for the complainant.

*Mr. John W. Wescott* and *S. Morris Waln* (of Philadelphia), for the defendants.

PITNEY, V. C.

Both the parties to this action were, at the time of the occurrences which gave rise to the litigation, engaged in real estate transactions, and both had their places of business in Philadelphia, and were brought together by a real estate broker of Philadelphia, acting on behalf of the complainant, named Garretson, who died before the hearing of the cause. He represented the complainant in making the bargain. The defendant was assisted by a Mr. Gimber, a member of the bar of Philadelphia, who also died before the hearing.

The original contract of October 17th, 1894, was not produced, but it was admitted to have been prepared by Mr. Garretson. It was executed at the office of Mr. Gimber, in Philadelphia. There is much conflict between the evidence of the complainant and the defendant as to the occurrences throughout the transaction; and I may say, at the start, that judging from the manner of the witnesses and all the developments of the hearing, I am constrained to place much more reliance upon the evidence of the defendant Webster than I can upon that of the complainant, McMichael. McMichael swears that the contract was written in Mr. Gimber's office in the presence of both parties. Webster swears that it was brought there by Garretson and the complainant already prepared. I adopt Mr. Webster's statement. So that the complainant is clearly responsible for the quantity of one hundred and eighty-five acres expressed in the contract.

31

McMichael *v.* Webster.

The parties met on the premises a few days before the execution of the contract, and on inquiry by the defendant, the complainant, as defendant swears, and I believe him, stated that the farm contained *one hundred and eighty-five acres and more.* The complainant denies this, but faintly, if at all. In fact, he admits that he did say that it contained about that amount. He says, however, that when the moment of the execution of the contract arrived, he strongly objected to naming one hundred and eighty-five acres as the contents, and only consented after an explanation by his broker, Mr. Garretson, that it made no difference, as it was stated to be "about one hundred and eighty-five acres, more or less." He swears that this discussion took place in Webster's presence. This is denied by Webster, and I accept his denial as worth more than complainant's assertion, not only because he is the more reliable witness, but because his conduct, immediately after he discovered the shortage, indicates that he relied upon the quantity as a material matter.

The effect of complainant's evidence on this part of the case, however, is to show that he did not execute the contract unadvisedly and without knowing its contents and considering its effect.

The deed of conveyance under which the complainant held the farm was not produced or shown to the defendant or his counsel, so far as appears, at any time until after the contract was signed.

The primary and important question to be determined is whether or not this representation of quantity was made through a mistake based upon an honest supposition that the farm actually contained that quantity of land, or whether it was willfully and knowingly false, and made for the purpose of influencing the defendant to purchase the property.

I am unable to find anywhere in the case the least evidence to support the theory that the complainant had any ground whatever to suppose that his farm contained any more than the sum of the acreage expressed in the deed. There was not the least dispute or doubt about the boundaries. It was flanked on two sides by a public highway, on the third by the creek and

McMichael v. Webster.

on the fourth by a well-defined line of partition with the adjoining owner. The description of the line along the creek inferentially called for low-water mark, and could not possibly go beyond it. There was no contention, or room for any, that there was any mistake in the computed areas stated in the deed by which the actual contents were understated.

But, in fact, no contention was made by the complainant that he thought that the several contents as stated in his deed were in anywise erroneous. He at first put himself upon the ground that the creek had changed its course along his line, and that a new berme-bank had been built along the creek subsequent to the origin of the description contained in the deed, and that by that means more land had been taken in. But there was not the least evidence to show any such change of course or that the new berme-bank pushed the low-water mark into the creek a particle. The evidence shows that at one end the new bank was further away from the creek than the old one, and that at the other end it was somewhat nearer.

The complainant's evidence tended to show, but not in a satisfactory manner, that at one end the acreage inside of the new berme-bank was increased by five acres and one-half, and on the other end the proof is clear that it was diminished about an acre. But such change did not affect the low-water mark a particle, nor had the complainant the least ground to suppose that it did. And so far as regards the acreage within the bank, the change would make an increase, at best, of not more than four acres. But a change in the bank would not necessarily change the low-water mark, which could result only from a change in the bed of the creek.

After the conveyance was passed and the transaction closed under circumstances presently to be stated, and the defendant had discovered the deficiency in acreage, he notified the complainant and demanded reparation, and the complainant then stated to him (defendant) that the one hundred and eighty-five acres were all there, and would so appear by a new survey, and that it was to be found by this increase of land taken in by a new bank.

At the hearing complainant produced a rough, inartistic map made by himself from measurements which he swore were made by himself shortly after the date of the conveyance, by which he shows a strip of land outside of the bank, between that and low-water mark, containing about forty acres. He made it up in this wise: he made the length along the creek eight thousand nine hundred and twenty feet (the actual distance is about four thousand feet), and the average width of the strip between high and low water one hundred and ninety-six feet, which made, as he swore, forty acres of land, and he swore positively that there is an average of more than two hundred feet in width from the bank to low-water mark.

Now, the base of the bank is at high-water mark, and a careful measurement, taken at an extremely low tide, shows the contents of the strip between high and low-water mark to be seven acres and seven-hundredths, leaving one hundred and forty-two acres within and including the bank. Another measurement, taken at ordinary low-water tide, makes the strip between high and low water five acres and sixty-one hundredths; and the proofs show that, in order to include one hundred and eighty-five acres, substantially the whole bed of the creek would be taken in; that it would require eleven feet in width and the whole length on the creek to make one acre, or three hundred and eighty-five feet in width to make thirty-five acres. The average width of the creek is about four hundred feet.

No attempt was made by the complainant, although he had ample time and opportunity, to overcome these careful measurements made by the defendant's surveyors, of the last one of which he had previous notice and an invitation to be present.

The result of these measurements shows clearly that the complainant deliberately attempted, by means of a grossly untruthful map, to mislead the court, and to thereby justify his assertion that there were one hundred and eighty-five acres in the tract.

Moreover, on the question of fraud, there is direct evidence. John Plasket, who lived in the neighborhood, testified that in a conversation with the complainant shortly after the sale, in speaking of it he said: "There was a little *humbugging*, but

McMichael v. Webster.

there was so much, 'more or less,' and that settled it; that he sold it for 'more or less,'" emphasizing the words "*more or less.*"

I conclude, from a consideration of all the circumstances, that the representation of acreage was made by the complainant fraudulently, and that the case is brought within the canon laid down by the late Judge Parker, speaking for the court of errors and appeals, in *Melick* v. *Dayton, 7 Stew. Eq. 245* (at *p. 249*), where he says: "There is no doubt that the question of abatement can be raised by a mortgagor, by answer in foreclosure proceedings, and, under certain states of facts, deduction from the mortgage will be ordered to the extent of the value of the deficiency. If a vendor *fraudulently* represents the number of acres to be greater than the actual number conveyed, and thereby *induces* the vendee to give more for the tract than he otherwise would, the vendee is entitled to an abatement. Abatement will also be made where there is *gross mistake.* Gross mistake is where the difference between the actual and the estimated quantity of land represented is so great as to clearly warrant the conclusion that the parties would not have contracted had they known the truth." It is hardly necessary to say that a difference of thirty-five acres in a farm of one hundred and fifty acres would be a " gross mistake," and cannot be overcome by the use of the words "about" and "more or less."

But the answer mainly relied upon by the complainant to this part of the defendant's case is that the defendant had notice of the actual quantity of land comprised in the conveyance before the transaction was closed, and had an opportunity to recede from the contract, and is, therefore, estopped from setting up this defence. This renders necessary a consideration of the circumstances attending the transfer of title.

The transaction was not an ordinary sale for cash, but an exchange of properties—that is, the defendant conveyed to the complainant certain real estate in or near the city of Philadelphia in exchange for this farm. After the preliminary contract had been executed the transaction took this course: The complainant handed to Mr. Gimber, counsel for the defendant, the

deed under which he claimed title to the farm, made to him by one Craig, dated September 2d, 1890, and in that document is found the description of the land in the four tracts before referred to. The defendant delivered to the complainant the title papers to the lands which he agreed to convey to the complainant. Each party, of course, wished to examine the title of the other, and it was agreed that each party should prepare the conveyance which he expected the other to execute. This cast upon Mr. Gimber the burden of examining the complainant's title to the farm and preparing the conveyance from the complainant to the defendant. In order to the proper carrying out of the transaction it became necessary for the defendant to procure a loan on the premises in question, and Mr. Gimber agreed to advance the money, but required a guarantee of the title from a title guarantee company, and for that purpose lodged complainant's deed with the Real Estate Title Insurance and Trust Company of Philadelphia. The delivery of the deed to the insurance company, and the signing of the formal application for insurance, was made by a Mr. Frank Benham, a clerk of Mr. Gimber. There was some discrepancy in the testimony as to what occurred on that occasion. Mr. Benham swears that he took the complainant's deed to the insurance company, handed it to the proper clerk and signed an application in blank and left the clerk to fill up the description himself from the deed, so that he (Benham) did not discover that the quantity of land described in the deed was less than one hundred and fifty acres, and further, that the application was to insure a farm of one hundred and eighty-five acres. In contradiction of Mr. Benham, two clerks in the insurance company's office swore that the description in the application was filled up by the insurance company's clerk in the presence and by the dictation of Mr. Benham, who read from the deed for that purpose, and there is nothing on the face of the written application which was produced to show that one hundred and eighty-five acres were mentioned. I am inclined to think that Mr. Benham is mistaken in his recollection, but I do not think that it was anything more than an honest mistake. The description in the application is abbreviated and in effect

simply states the four lots by the amount of their acreage. There is nothing to show, or lead to the belief, that either Mr. Benham or Mr. Gimber, at or before that time, had footed up the acreage of the four tracts so as to ascertain the sum of the four.

The regular course of business in such transactions is for the insurance company to make a preliminary examination of the title and send to the applicant a paper called a " settlement certificate," which shows the present condition of the title and the encumbrances thereon.

The object of this is to enable the parties to pass the title with safety, after which the conveyances are recorded, the searches continued down and the policy of insurance issued. In this case the settlement certificate is dated November 10th, 1894, and was returned on or about that day to Mr. Gimber, with the complainant's deed, to enable him (Gimber) to prepare the conveyance.

Mr. Benham swears that, according to his recollection, when the settlement certificate came in he first learned that the quantity of land was less than one hundred and eighty-five acres; that it was so reported to him by the insurance company. I am satisfied that that occasion was the first that he or Mr. Gimber knew of it, but I think he was probably mistaken as to the mode in which the same came to their knowledge. I think it was brought to Mr. Gimber's attention by his then looking over the settlement certificate and deed for the first time with care.

In the settlement certificate are these words: " Contents will be insured as more or less unless survey is produced," and a short description of the land gives the four tracts with their several contents, but not footed up to show the total.

More than that, a Mr. Henry, who was the conveyancer chosen by the complainant to prepare his conveyance and. attended to the passing of the title, swears that he had an interview with Mr. Gimber, after the settlement certificate came in, in which the subject was first discussed. So I think the weight of the evidence is that Mr. Gimber knew of the apparent discrepancy before the conveyance was passed. Mr. Webster (the defendant), however, swears, and I believe him, that he did not

hear of it either from Mr. Gimber or any other source until after the affair was closed. He swears that he and his wife executed the deed and mortgage and handed them to Mr. Gimber on the morning of the 13th of November; that the amount to be paid in cash was then ascertained; that he left his check for it and left the city for the country before the matter was entirely closed, and without any knowledge, as I have said, of the shortage; that a few days afterwards he called at Mr. Gimber's office and then, for the first, learned from Mr. Gimber of the shortage, and that they immediately called in Mr. McMichael, the complainant, and had an interview on the subject; that he (McMichael) then stated distinctly that the actual acreage, notwithstanding what was stated in the description, was one hundred and eighty-five acres, and that he would show it and make it right. The language imputed to him by Mr. Webster is:

"I will make that good; the ground is there; we will have it surveyed, and I will make it good. He said the acreage was there, but if not that he would make it good by other means."

The effect of Mr. Webster's evidence is that Mr. McMichael stated to him that he had built a new bank around the marsh and had taken in a quantity of land not reclaimed when the survey was made upon which the acreage in the deed was based. In this statement Mr. Webster is sustained by Mr. Gimber's clerk, Benham, who swears that he heard Mr. Webster say on several occasions that there were one hundred and eighty-five acres within the bank, and that if it was not there he would make it up; and that afterwards and after defendant had had his survey made (in the same year, 1894, by a surveyor who was out of the state at the time of the hearing) and the result stated to the complainant, he attempted to make it up by showing by the map which he had that the land was outside of the bank, and between that and low-water mark instead of inside the bank as first stated. Benham says that this first statement of complainant, that the acreage was within the bank, was made in Gimber's office about a week after the deeds were passed, when he was called there to meet Mr. Gimber and the defendant about

this matter of shortage, and that it was repeated on several occasions and adhered to until defendant's survey proved the contrary, when he shifted his ground by attempting to make it up outside of the bank and between that and low-water mark.

Mr. Henry, the complainant's solicitor above mentioned, swears that the interview between him and Gimber, in which Gimber called his attention to the shortage in acreage, took place on Saturday, the 10th of November, or Monday, the 12th, as the title finally passed, I think, on the 14th or 15th. In this I think he is mistaken, because Mr. Webster swears positively that he did not hear of it from Mr. Gimber before he left on the 13th, and Mr. Henry swears that while the deeds were all ready for delivery on the 13th, and they met for the purpose of passing them, and the amount to be paid was agreed upon, yet the deeds were not passed on that day but on a subsequent day, when Mr. Gimber, being asked whether Mr. Webster was satisfied (about the shortage), replied that he had not been able to hear from him, but he guessed it would be all right. This shows that after Mr. Gimber discovered the shortage he tried to communicate with Mr. Webster on the subject.

Now let us inquire what passed between Mr. Henry and Mr. Gimber (as I think on November 13th, after Webster left) with regard to the shortage in quantity. This is the language used by Mr. Henry:

"Mr. Gimber told us that there would not be any settlement on that day and referred to a settlement certificate. He said, 'I see that we only get one hundred and forty-nine acres and a fraction.' McMichael said that he thought there was more than that; that he ran to low-water mark in the creek; *that there had been some land made by change in the course of the creek, and that his new bank was further out than the old bank was;* but he said that it didn't make any difference; it was not too late, and there was no harm done yet if Mr. Gimber was not satisfied."

Upon that subject he says:

"There was nothing done until the following day, when we called upon Mr. Gimber, McMichael and myself did, *and I believe he was to hear from Mr. Webster,* and he then told us that he hadn't heard from him, but that he would not wait any longer, he would take the responsibility of delivering the papers— the deeds—himself, and he did deliver them, and told us it was all right, and he could record the papers and consider the matter settled."

That, he says, was after the day when Mr. Webster was there to leave his deed and mortgages, properly executed, after which he left for the country.

Now the fact that Mr. Gimber had tried to hear from Mr. Webster about the acreage indicates that he had learned of the shortage after Mr. Webster left. This witness, Mr. Henry, though he had been for years employed professionally by the complainant, and would naturally be interested on the side of his client, gave his evidence in a manner that leads me to believe that it is fairly reliable. McMichael's account of the interview makes it much stronger for him, but for reasons already stated I place no reliance whatever on his evidence.

It appears that as soon as Mr. Webster returned from the country, which was in about a week, Mr. Gimber called his attention to the amount of acreage stated in the deed, and caused a letter to be sent to the complainant to come to his (Gimber's) office and meet the defendant; that the complainant did come, and that then he made the statements and promises which are testified to by the defendant and Mr. Benham; that the defendant, shortly after that, went on and had a survey made, which (though not proven in court by reason of the absence of the witness, and was over and above the two made at the hearing) showed the acreage to be but one hundred and fifty acres, and communicated that to the complainant; and then the complainant, as hereinbefore stated, declared that the acreage was there and pretended to make the measurements and did make the map to which I have already referred.

The question is whether what occurred between Mr. Henry and McMichael, on the one side, and Gimber, acting for the defendant, on the other side, on or about the 13th of November, created an equitable bar against the defendant setting up this defence. I think it did not. The complainant did not state or admit to Mr. Gimber that the whole number of acres mentioned in the contract, namely, one hundred and eighty-five, was not actually contained within the description in the deed and would pass thereby, but declared that the quantity was actually there, and it will be observed that by reason of one of the courses run-

McMichael *v.* Webster.

ning along the low-water mark of the stream it was impossible
to ascertain whether this allegation was true or not without an
actual survey on the ground.

Now Mr. Henry reports his client as saying that *the course
of the creek had been changed* and that the embankment had been
put farther out, whereby the quantity of land was increased,
which was, in effect, saying that

" When that measurement was made which resulted in the acreage con-
tained in that deed from Craig to me, there may have been only one hundred
and forty-nine acres and a fraction there, but since that, by the change in the
course of the stream and the pushing out of the embankment, the quantity
has increased, so that my original representation contained in the contract of
sale is true."

Now Mr. Gimber had a right to rely upon that. The time
for the closing of the transaction was close at hand. Only a day
or two remained. His client was in the country. The state-
ment of Mr. McMichael was not of a mere matter of judgment
but of a positive fact, namely, a change in the course of the
creek and an advance of the low-water line and of the embank-
ment, making an increased acreage.

Now it seems to me too clear for argument that it does not lie
in the mouth of Mr. McMichael to say, "You should not have
believed me or relied upon my statement, but should have gone
on the ground and made a measurement." On the contrary,
under these circumstances, I think that Mr. Gimber was justi-
fied in accepting McMichael's assurance as to quantity. And
here it is to be observed that there was no necessity to change
the description, for if it were found that in running the course
along the creek the actual quantity of one hundred and eighty-
five acres instead of one hundred and forty-nine acres would be
contained, it would pass by the new deed, notwithstanding the
quantity was stated at a less amount than was actually contained
within its limits.

Then what occurred about a week after the defendant's return
from the country, is significant. The complainant, when called
upon, did not say

McMichael *v.* Webster.

"Why, you knew all about this beforehand; you knew there were only one hundred and forty-nine acres there, and accepted the conveyance by your attorney, Mr. Gimber, on that basis,"

but, on the contrary, insisted that the whole quantity was there and would so prove on a survey, and then, when the survey showed that it was not there, that even when going to low-water mark there were no more than one hundred and forty-nine acres, and at high-water mark only about one hundred and forty-two acres, he resorted to the miserable fetch of attempting, by a false map, to show forty acres between high and low-water mark, thereby taking in the whole bed of the stream.

The remarks I made, and the authorities cited in *Turner* v. *Houpt, 8 Dick. Ch. Rep. 526* (at *p. 535 et seq.*), seem to me to apply with more or less force to this case. It is not worth while to repeat them.

There can be no doubt but that the quantity of land influenced the defendant in the bargain. He swears distinctly that the complainant stated to him that the land was worth $200 an acre, and some of it $250 an acre, for farming purposes. And while the farm was not sold by the acre, yet its fertility was discussed and highly commended by the complainant, and its value consisted chiefly in its use for farming purposes, in which case, of course, acreage counts. Hence, the presumption must be that the amount of acreage, in the absence of proof, influenced the defendant's mind. It is here impossible, of course, to say, as was said in *Melick* v. *Dayton,* that the relative quantity is so small, taken in connection with other circumstances, as to show that it did not influence the mind of the purchaser.

The conclusion at which I have, for these reasons, arrived, is that the defendant is entitled to an abatement from the mortgage on account of its shortage of acreage, and the only remaining question is on what basis it should be ascertained. Defendant claims that it should be at the rate of $151 an acre, which is the rate by the acre at which the property was priced. The consideration mentioned is $28,000, which, for one hundred and eighty-five acres, is a little over $151 an acre. But I am unable to come to that conclusion. In the first place, it does not appear

with sufficient certainty that the price named in the deed was fixed as the actual value of the property, in the same manner as it would be if the transaction had been one for cash instead of an exchange of properties.   In the next place, such a valuation leaves out of account the buildings and fixed improvements, the value of which was not shown by any proof.   Taking all the evidence together, I am inclined to think that $100 an acre, or $3,500, should be credited on the mortgage as of the day it bears date.

Against this result the complainant makes the point that the mortgage can only be treated as a consideration-money mortgage to the extent of $2,500, because, by the original contract, $2,500 was to be paid in cash by the defendant to the complainant and included in this mortgage.   Beside that, a certain mortgage on defendant's property, which he, by the contract, should have paid and removed, and certain taxes and assessments, amounting in all to $2,500 more, the defendant failed to remove, and the complainant was obliged to assume those and include them in this mortgage, and in that way the amount was raised to $5,000. But I am unable to adopt that view.   When the parties came to settle the amount to be paid by the one to the other, it was found that, counting the encumbrances on the defendant's property, it would fall short of paying the complainant the amount of $28,000 by $5,076 and some cents, whereupon this mortgage was made and the $76 and odd cents paid in cash.   The whole affair was a single transaction, and I am unable to perceive how the mortgage is anything other than a consideration-money mortgage to its whole extent, and will so hold.

The other matters set up by the answer can shortly be disposed of.   With regard to the use and occupation of the premises, I hold that it is a mere matter of offset, and cannot come in here under the ruling of the court of errors and appeals in *Coriell* v. *Brown, 5 Dick. Ch. Rep. 753,* which binds me.

The same with regard to the few dollars that were collected for wharfage while the complainant remained in possession.

With regard to waste committed by the complainant, I am of the opinion that it comes in under the same principle as the

McMichael *v.* Webster.

shortage in the acreage of the land and should be allowed for. It was a willful diminution in value wrought by the complainant while mortgagee in possession of the mortgaged premises, by which they were rendered less valuable. And while I have been unable to find any direct authority upon the subject, and none was cited by counsel, I think allowance should be made for the waste. And without going into the evidence on this point, which was voluminous and quite contradictory, I will state my conclusion, briefly, to be that the complainant did, after the contract of October 17th, and I think in the main after the deed passed and while he was in possession, cut divers cedar trees and remove them from the premises, carefully concealing the stumps and removing the brush, so as to prevent the discovery of their cutting; that he tore down some sheds and removed some planking from the bridges and some other articles about the premises which should fairly be treated as fixtures. But I think that the damage to the premises by so doing has been overestimated by the defendant's witnesses, and that $100 will cover the whole. In arriving at that sum, I estimate the cedar trees cut at their full value, and I think that the defendant is entitled to have them so estimated as against the complainant, for the reason that they were growing trees and steadily increasing in value, and the injury to the farm by their removal was probably much greater than the present selling value of the trees when cut.

If either party is not satisfied with my estimate of the difference in value between the farm as it stood and what it would have been if it had contained one hundred and eighty-five acres, there may be a reference for that purpose. But if neither party asks for a reference, I will advise a decree for the complainant for $1,400, with interest from the date of the mortgage and the costs of the suit, not including the cost of witness fees and process therefor, but including the cost of one copy of the evidence which was written out for the use of the court and necessary for the determination of the cause.